IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SAM H. WILLIAMS                                                                                    PETITIONER

VS.                                                                     CIVIL ACTION NO. 3:08cv292-DPJ-FKB

RON KING                                                                                          RESPONDENT

**REPORT AND RECOMMENDATION**

This cause is before the Court on the petition for writ of habeas corpus filed by Sam H. Williams, a state prisoner in the custody of the Mississippi Department of Corrections. Having considered the petition and response, the undersigned recommends that the petition be dismissed with prejudice.

**I. FACTS AND PROCEDURAL HISTORY**

On the night of May 21, 2005, Williams and his girlfriend, Virginia Ann Kidd, arrived at Williams's home in Scott County, Mississippi for the night. Williams and Kidd had argued throughout the evening over Williams's refusal to comply with Kidd's request that Williams drive her to Newton, Mississippi. Around 11:00 p.m., Williams went to bed, and shortly thereafter Kidd entered the bedroom carrying a knife. It is disputed exactly what happened in the next few moments, but it is undisputed that Williams retrieved his .22 caliber revolver from under his mattress and shot and killed Kidd.

Williams was indicted in the Circuit Court of Scott County, Mississippi, for the crime of murder. His defense at trial was that he retrieved the gun to prevent Kidd from accessing it and that it went off accidentally when he tripped and fell. He was convicted and sentenced to a term of life imprisonment. Williams appealed his conviction and

sentence, raising the following two assignments of error:

1. The trial court erred in denying Williams's motions for judgment notwithstanding the verdict and for new trial, based upon the facts that the defendant was the only eyewitness, his testimony established that the homicide was excusable, and his testimony was not materially contradicted by other evidence.

2. The trial court erred in sustaining the prosecution's objection to the defense's cross-examination of Deputy Sheriff Gerald Greer concerning the potential for the murder weapon to discharge accidentally by striking a hard object.

The Mississippi Court of Appeals affirmed on January 29, 2008. *Williams v. State*, 973 So. 2d 1012 (Miss. Ct. App. 2008). Williams failed to file a timely petition for rehearing. However, in May 2008 Williams filed a motion for additional time and a petition for rehearing. By order dated May 28, 2008, the state court of appeals denied the motion for time and denied the petition for rehearing as untimely. By failing to file a timely petition for rehearing and obtain a ruling thereon, Williams forfeited his right to pursue discretionary review by the Mississippi Supreme Court. *See* Miss. R. App. P. 17(b) (requiring that petition for rehearing in court of appeals must be filed and judgment entered thereon before seeking review of court of appeals decision by supreme court).

Williams thereafter filed in the Mississippi Supreme Court an application for leave to proceed in the trial court with a motion for post-conviction relief (PCR), asserting the following four grounds for relief:

1. The trial court erred in denying Williams's motion for judgment notwithstanding the verdict.

2. The trial court erred in sustaining the state's objection to the defense's cross-examination question posed to Deputy Sheriff Greer.

3. The trial court erred in failing to specify whether his conviction was life with

>    or without parole.
>
> 4. The state's expert, Dr. Steven Hayne, was not certified by the medical board or by the coroner association of Mississippi.

The Mississippi Supreme Court denied relief on all four claims. The denial of claims one and two was based upon Miss. Code Ann. § 99-39-21(3) (the "*res judicata*" bar).[1] Claims three and four were denied as procedurally defaulted pursuant to Miss. Code Ann. § 99-39-21(1) (the "contemporaneous objection" rule).[2]

In his federal petition, Williams raises the same four claims as in his PCR application.

## II. ANALYSIS

### A. Grounds One and Two and the Sones Bar

Ground one (Williams's claim of insufficiency of the evidence) and ground two (the claim regarding the testimony of Deputy Greer) were presented to the Mississippi Court of Appeals in Williams's direct appeal. However, Williams failed to properly seek discretionary review by the Mississippi Supreme Court. In *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999), the Supreme Court held that where discretionary review is part of the state's established appellate process, that review must be pursued in order for appellate

---

[1]This section of Mississippi's PCR statute provides that the doctrine of *res judicata* applies to post-conviction review of claims which were decided at trial and on direct appeal. Thus, an issue decided on direct appeal will normally not be reconsidered at the post-conviction stage.

[2]Section 99-39-21(1) of Mississippi's PCR statute provides that the "[f]ailure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal . . . shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver."

review to meet the exhaustion requirement of § 2254.  The state relies on *O'Sullivan* to argue that because Williams failed to pursue these claims through the entire available appellate channels on direct appeal, he failed to exhaust them.  From there, the state reasons that because Williams no longer has any available means of pursuing these claims in state court, they are procedurally defaulted and barred from review by this court. *See Sones v. Hargett,* 61 F.3d 410, (5th Cir. 1995); *see also O'Sullivan,* 526 U.S. at 848; *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991).  Admittedly, this line of reasoning, upon initial consideration, seems logical.  More careful consideration, however, leads the undersigned to conclude that the state's analysis is incorrect.

An understanding of the issue is perhaps clarified by stating, first of all, that exhaustion *simpliciter* is not the issue.  There is no question, and the state does not dispute, that when Williams filed his federal habeas petition, he no longer had any available means for pursuing grounds one and two in state court.  Thus, he meets the technical requirements of exhaustion.  *See Coleman,* 501 U.S. at 731-33 (claims are technically exhausted when state relief is no longer available, without regard to whether the claims were presented to the state courts).  Rather, the issue before this court is whether Williams has procedurally defaulted his claims.  However, the concepts of exhaustion and procedural default, although distinct, do converge in at least one particular situation: Even if a petitioner technically meets the exhaustion requirement, if he has not *properly* exhausted his claims, they may be procedurally defaulted for purposes of habeas review.  *See O'Sullivan*, 526 U.S. at 848 (observing that, in the procedural default context, the court asks "not only whether a prisoner has exhausted his state

4

remedies, but also whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts"). A federal claim is *properly* exhausted if its substance has been fairly presented to the state's highest court in a procedurally proper manner and the state court has been given a fair opportunity to pass upon it. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999). If a petitioner has not given the state court this opportunity, and if he no longer has any means of doing so, he has technically exhausted, but his claim is procedurally defaulted, and therefore generally barred from habeas review. *Coleman*, 501 U.S. at 735 n. 1; *Sones,* 61 F.3d at 410.[3] Thus the relevant question in determining whether claims one and two are *Sones*-barred is whether Petitioner *properly* exhausted them.

In *O'Sullivan*, the Supreme Court held that because the petitioner, Boerckel, had failed to seek discretionary review by the state's highest court in the direct appeal process, no longer had any available avenue for presenting his claims in state court, and had not properly exhausted them, Boerckel had procedurally defaulted his claims. The state seeks to apply the holding in *O'Sullivan* to the present case. It is true that Williams, like Boerckel, failed to seek discretionary review by the state's highest court in the direct appeal process. However, unlike Boerckel, Williams subsequently presented his claims

---

[3] As the *Coleman* Court observed, in the absence of such a rule, a habeas petitioner would be able to avoid the exhaustion requirement by defaulting his federal claims in state court. *Coleman*, 501 U.S. at 732.

For a good discussion of the difference and interplay between the doctrines of exhaustion and procedural default, see Justice Stevens' dissent in *O'Sullivan*.

to the state's highest court in a post-conviction application.[4] The state deals with this distinction by arguing that Williams's PCR application was insufficient to constitute proper exhaustion because the *res judicata* bar of Miss. Code Ann. § 99-39-21(3) precluded review of the merits of the claims. But the question of whether Williams's exhaustion was proper does not turn on the likelihood that the state court would actually have granted relief or even considered the merits of the claim; it turns on whether an "available procedure" was used to present the claims to Mississippi's state's highest court. *See O'Sullivan* at 847 ("the exhaustion doctrine . . . turns on an inquiry into what procedures are 'available' under state law").[5] Mississippi's post-conviction statute provided a procedure for Williams to present his claims to the state's highest court, and Williams used that procedure by properly filing an application for post-conviction relief. That is all that "proper exhaustion" demands.

The state has identified no other basis for application of the procedural default rule to ground one of the petition. While it is true that the state supreme court declined to

---

[4]Exhaustion requires only that a claim be presented to a state's highest court once, either on direct review or in an application for post-conviction relief. *Carter v. Estelle*, 677 F.2d 427, 443 (5th Cir. 1982).

[5]It was not a foregone conclusion that the state court would refuse to consider Williams's previously-determined claims. The Mississippi Supreme Court has, on occasion, recognized exceptions to the *res judicata* bar. *See, e.g., Simon v. State*, 857 So. 2d 668 (Miss. 2003) (reviewing merits of claim in the alternative where claim involved a "fundamental right" ); *Gilliard v. State*, 614 So. 2d 370 (Miss. 1992) (reviewing claim, notwithstanding the *res judicata* bar, where claim involved issue on which an appellate court had "suddenly reversed itself"); *Lockett v. State*, 614 So. 2d 888 (Miss. 1992) (suggesting exception would be made for a novel claim or intervening decision).

consider the merits of this claim, that refusal was not because the court found the claim to be procedurally defaulted. Rather, it refused to consider the claim because it had already been considered on the merits on direct appeal. "When a state court refuses to readjudicate a claim on the ground that it has been previously determined, the court's decision does not indicate that the claim has been procedurally defaulted." *Cone v. Bell*, 129 S.Ct. 1769, 1781 (2009). Accordingly, the undersigned concludes that Petitioner has not defaulted his sufficiency-of-the-evidence claim and that it may be reviewed by this court.

The posture of ground two, the claim concerning the trial court's sustaining the state's objection to a portion of Deputy Greer's testimony, is somewhat different. In its order denying post-conviction relief, the Mississippi Supreme Court stated that it was declining review for both claims one and two because they had already been considered on the merits on direct appeal. The court of appeals had considered the merits of claim two only in the alternative; its primary holding was that the claim was barred from appellate review because Petitioner had failed to make a proffer of the proposed testimony at trial and had therefore failed to properly preserve the issue for appeal. Thus, a strong argument could be made that Williams defaulted this claim in state court and that therefore it is barred from review by this court. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). However, in its order, the Mississippi Supreme Court explicitly stated that this claim had been "addressed on direct appeal and decided adversely to Williams" and was "barred by the doctrine of *res judicata*." (Docket No. 9, Ex. 1). Therefore, it cannot be said that "the last state court to consider the claim expressly and

7

unambiguously based its denial of relief on a state procedural default." *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999). For this reason, the undersigned will treat this claim as having been adjudicated on the merits within the meaning of § 2254(d).

### *B. Procedurally Defaulted Claims*

Grounds three and four of the petition were presented to the Mississippi Supreme Court in Williams's PCR application, and both were rejected as procedurally barred pursuant to Miss. Code Ann. § 99-39-21(1) because of Williams's failure to raise them at trial and/or on direct appeal. Where a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman,* 501 U.S. at 750.

Williams has failed to show that the state's procedural bar was inadequate to support rejection of these claims. Neither has he made any showing as to cause for his default, actual prejudice as a result of the alleged constitutional violations, or that failure to address the claims will result in a fundamental miscarriage of justice. *See id.* The undersigned concludes that the state court's holding that claims three and four were procedurally barred precludes this court's consideration of their merits.

### *C. Standard of Review for Claims Adjudicated on the Merits in State Court*

Ground one of the petition was previously presented to and adjudicated on the merits by the state court of appeals within the meaning of 28 U.S.C. § 2254(d). Likewise,

8

for the reasons stated *supra*, the undersigned is treating ground one as having been adjudicated on the merits. These claims are therefore subject to the highly deferential standard of review set forth in 28 U.S.C. § 2254(d), which allows habeas relief in this case only if the state court's rejection of a claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* A state court decision is "contrary to" clearly established Supreme Court precedent if it applies a rule that contradicts governing law or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result which differs from Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). On the other hand, the "unreasonable application" clause governs where the state court correctly identifies the governing legal rule but applies it unreasonably to the facts of a prisoner's case. *Id.* at 407-08.

The Supreme Court has repeatedly emphasized that "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* (quoting *Williams*, 529 U.S. at 411). Rather, the application must be not only incorrect, but also "objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409). Where a federal habeas court concludes that a

9

constitutional violation did occur, it must go on to ask whether any arguments supported, or *could have supported*, the state court's rejection of the claim, and whether it is possible that fairminded jurists could disagree as to whether the state court's decision is inconsistent with a prior United States Supreme Court decision. *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011). Habeas relief is available only where the petitioner establishes "that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

### D.  Ground One:  Williams's Jackson v. Virginia Claim

Williams argues that he is entitled to relief from his conviction because the evidence presented at trial was insufficient to support the verdict. Insufficiency of the evidence results in a constitutional violation and warrants habeas relief only where the reviewing court concludes, considering the evidence in the light most favorable to the prosecution, that *no* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The undersigned concludes for the reasons set forth *infra* that Petitioner has failed to establish a constitutional violation.

The state's evidence at trial consisted primarily of the testimony of law enforcement officers and of the forensic pathologist who performed the autopsy on the victim. Mike Lang with the Scott County Sheriff's Department was the lead investigator on the case. He testified as to two oral statements given to him by Williams. The first of these occurred during an interview on May 23, 2005 - two days after the incident. After

signing a waiver of rights form, Williams relayed the following account of the events leading up to Kidd's death: Williams and Kidd had been involved in an off-and-on relationship for several years. On this particular day, Williams was selling clothing at a convenience store in Scott County when Kidd arrived in a car with several other individuals. She got out, and during her conversation with Williams, she asked him to take her to her family's residence in Newton, Mississippi. Williams refused, suggesting that she should have asked the folks in the car to take her. At some point Kidd stated that she wanted something to eat, so the two of them went to a fish house. Afterwards they purchased some crack cocaine. Kidd smoked the crack while Williams drank some gin and talked with another man on the side of the road. They then proceeded on to Williams's residence, where they continued their argument. Williams announced he was going to bed, and went back into his bedroom and got into the bed. Shortly thereafter, Kidd came into the room holding a knife. She stumbled and fell, telling Williams that she had cut herself. Williams got out of bed to check on her but saw no blood. He helped her up, and she left the room for a few moments. Williams then retrieved a .22 pistol which he kept cocked under his mattress. Williams tripped over the clutter in the floor and fell, causing the gun to fire and shoot Kidd, who was standing in the doorway.

According to Deputy Lang, Williams's second statement, which was taken on August 24, 2005, was very similar to the first. Lang testified that the main difference between the two statements was that in the second statement Williams claimed that his reason for getting his gun was that he was afraid Kidd might try to get it during the night, whereas in the first statement Williams indicated that his reason for retrieving the gun was

11

because he felt that his life was being threatened.

Deputy Sheriff Gerald Greer also assisted in the investigation.  He was dispatched to the scene of the shooting and was present at both interviews with Williams.  Greer described Williams's bedroom as a small room with stacks of clothes covering most of the floor. During his testimony, a tape recording of the second interview was played for the jury.  No copy of the tape has been included in the record before this court.  However, Greer's reading from portions of the statement and his testimony about it indicates that during the second interview, Williams stated that he had fallen twice and that the gun had discharged during the second fall when he fell against a door facing.   Greer also testified concerning the gun used by Williams.  He described the weapon as a .22 caliber single-action revolver that cannot be fired unless the hammer is in a cocked position.

Also testifying for the prosecution was Dr. Steven Hayne, who stated that Kidd died from a gunshot wound to the front left side of the head in the left temple area.  According to Dr. Hayne, the bullet traveled from the point of entrance in essentially a horizontal line - approximately  twenty-five to thirty degrees  - toward the right back of the brain.   He opined that the trajectory of the bullet indicated that if the victim had been standing erect and facing forward at the time of the shooting, the gun would necessarily have been raised to the level of her front temple when it fired.

Williams was the only defense witness at trial.  His description was in most respects consistent with his previous statements.  Williams explained that he retrieved the gun to move it out of the room and that this was something he normally did when Kidd "would be like this."  When he tripped the first time, the hand holding the gun went

12

through a fan on a small table near the bed. He then turned to start out of the bedroom door when he tripped again. This time, he fell forwards towards the door, his hand with the gun hit the door facing, and Kidd was standing in the doorway when the gun went off. He denied ever having told Lang that he kept the gun cocked under the mattress. He said that he told Greer that the gun must have been forced into the cocked position when he fell into the fan.

The jury could reasonably have concluded - and undoubtedly did conclude - that Williams's version of the shooting was implausible, especially given the evidence regarding the trajectory of bullet. In light of the evidence presented against Williams, it cannot be said that *no reasonable juror* could have found him guilty beyond a reasonable doubt. For this reason, the undersigned concludes that the state court's rejection of this claim did not result in an unreasonable application of *Jackson v. Virginia.*

### E. Ground Two: Cross-Examination of Deputy Greer

During his cross-examination of Deputy Greer, defense counsel posed a question to which the prosecution objected, and the court sustained the objection:

Q. Okay. Mr. Greer, just one last time. The hammer rests against the pin on this particular gun; right?

A. That is correct.

Q. And when he fell up against the door facing, it could have went off?

Prosecutor: Objection, Your Honor.

Court: What is your objection?

Prosecutor: He is asking again what could have happened, what is possible.

Court: Sustained.

Tr. 114.

Generally, evidentiary rulings do not raise a cognizable habeas claim. Habeas relief is available for the exclusion of testimony only if it violates a specific constitutional right or is so egregious that it renders a trial fundamentally unfair. *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005). The court of appeals, in rejecting this claim, stated that "any testimony concerning the propensity for pistols of that type to accidentally fire while *not* cocked would have been irrelevant," because "[i]n every account of the killing Williams gave, in interviews and at trial, he never denied that the pistol *was* cocked when it fired the fatal bullet." *Williams*, 973 So.2d at 1017 (emphasis in original).

As to whether the gun was cocked when it fired the fatal bullet, Williams testified to the following on cross-examination and redirect at trial:

> Q.   Now, show me how you fell into a door facing and it went off.
>
> A.   When I started falling, I throwed my hand up like this (indicating) and the gun went off when my hand hit the door.
>
>   . . .
>
>   I had tried to catch - - I had reached for the bed with my left hand, and I was still going down. That's when I throwed this hand up.
>
> Q.   Was the hammer on that gun cocked back?
>
> A.   Obviously it was.
>
> Q.   So, this wasn't one of those deals where you throw it on the floor and it went off, or the gun banged against the door and went off. That hammer was cocked back is what you are saying?
>
> A.   Yes, sir.
>
> Q.   In fact, that's what you told the Sheriff's Deputies?

> A. Yes, sir.
>
> Q. You first told Mike Lang that you kept it cocked under your mattress?
>
> . . .
>
> A. No, sir. My statement was it must have got cocked when I fell and my hand went down through the fan.
>
> . . .
>
> Q. Wouldn't you admit to me, Mr. Williams, that's a mighty high degree of coincidence that you would fall two times, one time cocking the gun and the second time it going off?
>
> A. When I fell onto the floor and fell into the fan, that's when the gun got cocked. I don't really know when it got cocked. That's the only time it could have got cocked.
>
> Q. Except maybe if you cocked it yourself?
>
> A. No, sir, I didn't cock it. . . .
>
> . . .
>
> Q. You fell down one time and cocked the gun, and you tripped and fell into the door the second time and caused the gun to go off. That's what you are asking these folks to believe?
>
> A. That's the truth, sir. . . .
>
> . . .
>
> Q. Sam, you don't know if that gun was cocked; do you?
>
> A. No, sir.

Tr. 122-24 and 126.

      The undersigned disagrees with the state appellate court's characterization of Williams's statements concerning whether the gun was cocked. Williams did not unequivocally testify that the gun was cocked when it fired. Rather, one reasonable

interpretation of his testimony on cross-examination was that he *assumed* that it was cocked due to the fact that it fired, and he testified on redirect that he did not know whether it was cocked.

Considering Williams's equivocation, testimony as to whether the gun could have discharged accidentally without being cocked would have been relevant. But, Williams cannot show that the exclusion of Deputy Greer's testimony rendered his trial fundamentally unfair. The point defense counsel sought to make through Deputy Greer was that Williams's gun lacked a particular safety mechanism which made it susceptible to firing accidentally without being cocked by hitting it against a hard surface (for example, a door facing or by being dropped on a floor), and defense counsel had already made this point through an earlier portion of Deputy Greer's testimony:

> Q. Do you know if the hammer in this gun rests against the pin?
>
> A. Not without looking at it.
>
> Q. I will give it back to you.
>
> A. (Examining) This gun falls on the firing pin.
>
> Q. Okay. I know some more expensive guns like your Colt, for example, they have a mechanism that would keep the hammer off the pin. It's a safety mechanism; isn't that correct?
>
> A. Uh-huh.
>
> Q. That's, for example, such as people dropping guns and things like that; isn't that correct?
>
> A. That's correct.
>
> Q. Isn't it possible that you can drop a single action pistol and it can theoretically go off?

16

> A. It could. I mean in my opinion.
>
> Q. With that gun, is it possible?
>
> A. I would say it's possible. I'm not testifying as an expert gunman.
>
> Q. Okay. That's all I wanted to know. So, you can't testify it's not possible that the gun went off without him manually pulling back the hammer and then pulling the trigger?
>
> A. I would say it's not impossible.

Tr. 109.

In closing argument, Williams's counsel specifically used Greer's above-quoted testimony and inspection of the gun to support an argument that the gun lacked a particular safety mechanism and, therefore, could have discharged accidentally without the hammer being cocked. *See* Tr. 136. Clearly, Williams was not prejudiced by the exclusion of testimony which Deputy Greer had essentially already provided.

The exclusion of Deputy Greer's testimony did not violate Williams's constitutional rights or render his trial fundamentally unfair. Habeas relief is not available on ground two.

### III. **CONCLUSION**

The state court's rejection of grounds one and two of the petition did not result in an unreasonable application of clearly-established Supreme Court law. The remainder of Plaintiff's claims are procedurally barred. For these reasons, the undersigned recommends that habeas relief be denied and the petition dismissed with prejudice. The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendation contained within this report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon

grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court.  28 U.S.C. § 636; Fed. R. Civ. P. 72(b); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Respectfully submitted, this the 15th day of August, 2011.

/s/  F. Keith Ball
UNITED STATES MAGISTRATE JUDGE